Thomas S. Crow v. Commissioner.
Crow v. Commissioner
Docket No. 6315-65.
United States Tax Court
T.C. Memo 1970-283; 1970 Tax Ct. Memo LEXIS 78; 29 T.C.M. (CCH) 1321; T.C.M. (RIA) 70283; October 5, 1970, Filed Thomas S. Crow, pro se, 34 Windsor Dr., Little Silver, N. J., Frank N. Panza, for the respondent. RAUM
Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency of $56,759.49 in the income tax of Thomas S. and Doris B. Crow for the calendar year 1962. The only question presented is whether Thomas S. Crow incurred a net operating loss in the amount of $156,000 during the calendar year 1965, giving rise to a net operating loss carryback deduction for the calendar year 1962. Findings of Fact The parties have stipulated certain facts which are incorporated herein by this reference. Petitioner, Thomas S. Crow, and his wife, Doris B. Crow, filed joint Federal income tax returns for the calendar years 1961 through 1967 with the district director of internal revenue at Newark, New Jersey. 1322 At the time the petition in this case was filed, petitioner resided in Little Silver, New Jersey. In 1960 petitioner had a one-third interest in Pistell, Crow, Inc., an investment banking firm. A member of the *80 American Stock Exchange, Pistell, Crow, Inc., dealt in institutional securities and retail securities, and also participated in over-the-counter trading and underwriting. Petitioner was in charge of the firm's underwriting activities. However, he also devoted a considerable portion of his time to his own investments. Petitioner was "involved [in the firm] up until the end of 1961," [1] and Pistell, Crow, Inc., remained in business for about two years thereafter. Early in 1960, petitioner received a prospectus, dated February 1, 1960, which was issued in order to raise funds to finance a new corporation. The prospectus described the objective of the enterprise as follows: Objective To organize a company to design, develop, prototype manufacture and produce mechanical and/or electro-mechanical devices in the printing, punching and paper handling and electronic fields, in areas where the large companies so involved show little interest, but where need is great and is known to exist. An example *81 of such an item is the printer and keyboard section of an advanced type Airlines Reservation System. The market is limited, but the printing and paper handling functions are essential. It takes the skills of an organization such that proposed to accomplish the task. Numerous other similar situations are known to exist. The aforementioned system requires a simple low cost electronic memory and/or an optical scanning device. Talents will be available in the new organization to compentently and economically accomplish the type of task described. The prospectus stated that as the result of an anticipated reduction in the domestic operations of a large American corporation (apparently the Underwood Corporation, which was then about to merge or in the process of merging with the Olivetti Corporation of Italy), a number of highly skilled individuals would become available to take over the work on a variety of subcontracts which their former employer was discontinuing. The prospectus enumerated 14 "Known Potential Contracts-First Year" and valued them at $1,654,000. It then stated: The probability of obtaining a number of the above contracts is high, on others it is moderate. All are considered *82 live prospects for the new organization to undertake. Many hold promise of production potentials which will assure the growth of a balanced profitable organization. This list is also presented to demonstrate example of the type of work known to be available. The prospectus outlined the corporation's cash requirements as follows: Cash Requirements - First year of operation Founding Group Salaries
$ 75,000
Business Manager Salaries
15,000
Technical Support Group 90,000
$180,000
Overhead-assumed at 50% 90,000
$270,000
Reserve for contingency and proprietory product design 30,000
$300,000
Shop, Quality control and test Equipment acquisition (Cap- ital expense)
100,000
Recommended Capitalization - Total -
$400,000
NOTE - The annual payroll of $90,000 for the shop plus $45,000 overhead are considered as offsets against indicated availability of shop type work. Experimental shop capabilities are in great demand in this area. It is anticipated that the shop can carry itself, or do better, from the start. In order to induce potential customers to make firm commitments to this group, the presentation of a stable financial picture is essential. *83 The organizing group is confident the new company can make a profit in the first year of operation and that sales in the first year will exceed $500,000. The potential to surpass this conservative estimate, by a substantial margin, very clearly exists. At the bottom of the prospectus was the following handwritten statement: handwritten statement: I certify that all statements contained herein are true to the best of my knowledge (Signed) Harold M. Kneller 1323 The enterprise was incorporated in April of 1960 under the laws of the State of Connecticut as the Connecticut Technical Corporation (the "Corporation"). Its certificate of incorporation provided in part as follows: Fourth: That the amount of the capital stock of said corporation hereby authorized is (a) One Hundred Fifty Thousand (150,000) Dollars divided into Fifty Thousand (50,000) shares of common stock of the par value of One (1) Dollar each. (b) and Ten Thousand (10,000) shares of six (6) per cent cumulative preferred stock of the par value of Ten (10) Dollars each. The stock shall be divided into classes as follows: Fifty Thousand (50,000) shares common (par value $1.00 each). Ten Thousand (10,000) shares *84 of six (6) per cent cumulative preferred (par value $10.00 each). The holders of the preferred shares shall not be entitled to vote. The holders of the common shares shall not be entitled to any pre-emptive rights. The preferred stock may be redeemed by a seventy-five (75) per cent vote of the entire board of directors. Any action requiring a vote of the common stockholders shall be carried only upon an affirmative vote of sixty-six and two-thirds (66 2/3) per cent of the entire issued and outstanding common stock. In the event of the voluntary liquidation or dissolution of the corporation the holders of the preferred shares shall be entitled to receive out of the assets of the corporation, whether such assets are capital or surplus, the sum of Ten (10) Dollars per share plus accumulated dividends. In the event of involuntary liquidation or dissolution of the corporation the holders of the preferred shares shall be entitled to receive out of the assets of the corporation, whether such assets are capital or surplus, the sum of Ten (10) Dollars per share plus accumulated dividends before any payment shall be made or any assets distributed to the holders of the common shares *85 if, upon any liquidation or dissolution, whether voluntary or involuntary, the assets thus distributed among the holders of preferred shares are insufficient to permit the payment to such shareholders of the full preferential amounts thereof, then the entire assets of the corporation shall be distributed ratably among the holders of the preferred shares. After payment or distribution to the holders of preferred shares of such preferential amounts the holders of common shares shall be entitled to receive ratably all remaining assets of the corporation. A consolidation or merger of this corporation with or into any other corporation or corporations shall not be deemed to be a liquidation or dissolution within the meaning of this clause. Fifth: That the amount of capital stock with which this corporation shall commence business is Nineteen Thousand (19,000) Dollars. On April 13, 1960, the first meeting of the Corporation's subscribers and stockholders was held. At that time the Corporation's by-laws were adopted. They provided in part as follows: ARTICLE VI DIVIDENDS AND FINANCE Section 1. Dividends to be paid out of the proceeds and surplus earnings of the corporation shall be *86 declared by the board of directors at its option but no dividends either on the common or preferred stock shall be paid which will impair the capital of the corporation. Petitioner purchased 12,000 shares of the Corporation's common stock at $1 per share. On or about April 13, 1960, petitioner and the Corporation entered into an agreement, dated April 13, 1960, wherein petitioner (identified therein as the "Investor") promised to purchase 9,500 shares of the Corporation's six percent, cumulative preferred stock at $10 per share and $95,000 of the Corporation's six percent, five-year debentures. The agreement provided in part as follows: WHEREAS, the Corporation is desirous of obtaining proper financing for the operation and expansion of its business and; WHEREAS, the Investor is desirous of buying common stock in the Corporation, and; WHEREAS, the Investor has been allowed to be an incorporator in the said Corporation and has been allowed to purchase twelve thousand (12,000) shares of common stock of the said Corporation at at the same price per share as the operating management of said Corporation has paid, * * * * * * NOW THEREFORE, in consideration of the foregoing and *87 of the mutual promises of each of the parties made to the other, it is agreed as follows: 1. The Investor shall purchase Nine Thousand Five Hundred (9,500) shares 1324 of the Ten (10) Dollar par six (6) per cent cumulative preferred stock and shall pay therefor the sum of Ten (10) Dollars per share and shall also purchase Ninty-five Thousand (95,000) Dollars of the Corporation's six (6) per cent five (5) year debentures at a time and in accordance with the terms and conditions of this Agreement. 2. The Investor shall purchase at all and debentures. times equal amounts of preferred stock 3. Said Investor shall purchase five thousand (5,000) Dollars worth of said preferred stock and debentures per month, with the first payment being due on May 1, 1960 and payments being due monthly thereafter on the first day of the month. The said Investor shall deposit with Attorney Norman Ebenstein, 36 Pearl Street, Hartford, Connecticut, by the first of each month, his check in the amount due, which shall be held in escrow by the said Attorney Norman Ebenstein until he is in receipt of and has mailed to the said Investor properly executed preferred stock certificates and debentures in the *88 amount paid for. 4. The Investor shall also purchase additional preferred stock and additional debentures as funds are needed by the Corporation as determined jointly by Harold Kneller, President of the said Corporation and the Investor. * * * 8. Nothing in this Agreement to the contrary notwithstanding shall require the Investor to purchase a total of more than nine thousand five hundred (9,500) shares of preferred stock and Ninety-five Thousand (95,000) Dollars worth of debentures. * * * 10. It is specifically further understood and agreed by and between the parties that the Investor shall have purchased the entire One Hundred Ninety Thousand (190,000) Dollars worth of preferred stock and debentures of the Corporation before the Corporation shall seek any additional moneys whether by sale of additional stock, debentures or borrowings of any kind. 11. It is specifically understood between the parties that the securities acquired and to be acquired hereunder are and will be taken for purposes other than for distribution and the securities will be so endorsed, which endorsement will in addition state that they were acquired and are subject to the terms of this Agreement. * * *89 * 13. This Instrument contains the entire agreement of the parties. It may not be changed orally but only by an Agreement, in writing, signed by the party against whom enforcement of any waiver, change, modification, extension, or discharge is sought. Paragraph 11 was designed to prevent petitioner from making a public sale of the securities purchased pursuant to the agreement. At the time the agreement was executed, it was contemplated that while petitioner's anticipated total investment of $202,000 in the Corporation (together with the investment of approximately $8,000 by the Corporation's operating management) would be sufficient to initiate the enterprise, the remainder of the desired $400,000 total capitalization would eventually be secured through a public offering. Pursuant to the foregoing agreement, petitioner gradually purchased a total of 7,350 shares of the Corporation's preferred stock and $73,500 of its debentures, thereby furnishing the Corporation with a total of $147,000, in addition to his payment for its common stock. Purchases of the preferred stock and debentures were made periodically between May 1, 1960, and February 5, 1962, inclusive; they were generally *90 made on a monthly basis, and each purchase ordinarily amounted to 250 shares of preferred and $2,500 of debentures. Petitioner served as the chairman of the Corporation's board of directors and was active in its financial affairs. Petitioner lived in New Jersey, and the Corporation's business was carried on in Hartford, Connecticut. However, petitioner made frequent telephone calls to Howard Kneller, the Corporation's president, as well as a number of visits to Hartford. Petitioner did not receive any compensation as an officer or director of the Corporation, nor was he otherwise compensated for his activities in its behalf. During its first two years the Corporation encountered serious financial difficulties. It failed to obtain any of the contracts which its prospectus had described as "known potential contracts" and which had originally been considered one of the principal factors indicating the future success of the enterprise. Furthermore, one of the Corporation's major customers also experienced financial difficulties and eventually went into bankruptcy. At the time it entered 1325 bankruptcy, the firm owed the Corporation some $42,000 for services performed in its behalf. *91 Consequently there were substantial arrearages in the interest payments on the Corporation's debentures, which were to be paid regardless of earnings, and on the dividends with respect to its cumulative preferred stock, which were to be paid out of earnings. Because of this unhealthy financial condition, it became unlikely that the Corporation would be able to raise the additional $190,000 originally contemplated by petitioner and other corporate officers. Furthermore, in petitioner's view, the funds which would have been provided if he continued to purchase debentures and preferred stock in accordance with the terms of the 1960 agreement would alone have been inadequate to finance the Corporation properly. As a result of these difficulties, petitioner advanced no additional funds to the Corporation after February 5, 1962. He thus furnished $43,000 less than the $190,000 which it had been contemplated he would invest in the Corporation's debentures and preferred stock. The Corporation suffered damages as the result of petitioner's failure to continue his investments in the Corporation. In at least two instances, the Corporation failed to receive contracts because prospective customers *92 were not satisfied with the Corporation's financial position. However, the record does not disclose the precise extent of the damages sustained. The Corporation's general counsel concluded that petitioner had violated the agreement of April 13, 1960, and that the corporation had suffered damages as a result, and therefore recommended that the Corporation sue him for breach of contract. His recommendation to sue petitioner was overruled, apparently because the Corporation's other officers wanted to avoid the animosity which a lawsuit might generate. However, on August 9, 1962, at a meeting of the Corporation's board of directors, at which petitioner was not present, the following resolution was adopted: WHEREAS, the Corporation has a contract with Thomas Crow, and; WHEREAS, the said Thomas Crow is in breach of said contract. IT IS RESOLVED: That the President of the Corporation, Harold M. Kneller, is authorized and instructed to negotiate a settlement of said breach of contract with Mr. Crow and to report back to the Board, for final approval, any tentative agreements reached. On February 18, 1964 the Corporation's outstanding authorized stock and debentures were as follows: *93 Common Stock
Thomas S. Crow
12,000 shares
Harold Kneller
5,000 shares
William Hildebrandt
1,000 shares
Daniel Esakov
1,000 shares
Vincent A. Malestta
100 shares
A. John Macchi 450 shares
19,550 shares
Preferred Stock Thomas S. Crow
7,350 shares
Debentures Thomas S. Crow
$73,500.00
On or about February 19, 1964, petitioner and the Corporation entered into an agreement under which petitioner agreed to waive all accumulated interest on the debentures and all dividends accumulated on the preferred stock, and to return all of the debentures and preferred stock, as well as 10,000 shares of the Corporation's common stock. The agreement provided in part as follows: WHEREAS, Conn. Tech. and Crow entered into certain agreement dated April 16, 1960; [2] and WHEREAS, Crow was to make certain investments, in accordance with said agreement, in Conn. Tech, by virtue of purchasing a certain amount of preferred stock and debentures in accordance with the terms of said agreement; and WHEREAS, Crow has not made the entire investment called for in said agreement; and WHEREAS, Conn. Tech. *94 is desirous of having Crow surrender to Conn. Tech. a part of his common stock. NOW THEREFORE, it is agreed between the parties hereto as follows: 1. Any and all accumulated interest on the debentures purchased by Crow and any and all dividends accumulated on the preferred stock purchased by the said Crow are hereby extinguished, waived and relinquished by the said Crow. 2. The said Crow shall return to Conn. Tech. all of the debentures and preferred stock issued to him which shall be cancelled and shall have a face amount of $147,000. 3. The said Crow shall return to the said Conn. Tech. 10,000 shares of the common stock issued to him which said stock the said Conn. Tech., at the election of a finance 1326 committee made up of Harold Kneller, John D. Rusher, Jr. and Crow, will sell in the amount necessary to obtain adequate financing for the corporation. 4. In exchange for the return of the debentures, preferred stock, and cancellation of the debenture interest, as set forth above, the said Conn. Tech. shall forthwith issue to Crow $157,000 worth of new preferred stock; said new preferred stock will be six (6%) per cent noncumulative unless fully earned, and shall provide *95 further that in any year in which Conn. Tech.'s after tax earnings exceed $30,000 that the preferred dividend must be paid. 5. Conn. Tech. in further consideration of the promises of the said Crow contained herein, hereby releases the said Crow from any and all claims it has or might have against the said Crow by virtue of the said Crow's breach of the aforesaid agreement. 6. The said Crow further agrees that upon the execution of this agreement he will immediately resign as chairman of the Board of Directors of said Conn. Tech. although he will remain as a director, and further that he will procure the resignations of James T. Glavin and Robert M. Ghen, and further that in order to effectuate his resignation as chairman of the board and the resignations of James T. Glavin and Robert M. Ghen as directors of Conn. Tech., that all documents as determined necessary to accomplish the same will be signed upon request. The parties never fully complied with the terms of the agreement. The Corporation's board of directors never formally ratified the agreement or amended the by-laws to provide for the noncumulative preferred stock mentioned in the agreement, and the Corporation never *96 issued such noncumulative preferred stock. Petitioner continued to serve as chairman of the Corporation's board of directors, and did not procure the resignation of the two directors named in the agreement. However, on or about November 27, 1964, petitioner surrendered all of his preferred stock, debentures, and common stock to the Corporation. The record does not reveal why petitioner surrendered all 12,000 shares of the common stock rather than the 10,000 shares required by the agreement. The debentures and the preferred stock returned by the petitioner were not cancelled until October 20, 1965. Sometime after January 1, 1965, petitioner and the Corporation agreed (apparently ignoring petitioner's prior surrender of securities that in order to attract new capital into the Corporation, it would be necessary for petitioner to relinquish a substantial part of his investment in the enterprise. In approximately July of 1965, Mr. Ellsworth S. Grant, president of the Charter Oak Realty Company ("Charter Oak") expressed his firm's interest in investing in the Corporation. However, Charter Oak's interest was subject to a number of conditions, one of them being that petitioner's position *97 with respect to the Corporation's earnings be reduced. At one point, Charter Oak proposed the "[execution] of agreement with Mr. Crow regarding his stock interest, with a 10-year moratorium on interest payments." At the time, petitioner served as a member of the Corporation's three-man finance committee. During the ensuing negotiations, Harold M. Kneller, president of the Corporation, proposed To offer Mr. Crow approximately 1,000 additional shares of common stock in exchange for the special class of preferred stock to which he is presently entitled (value $157,000.). He has indicated that an adjustment of approximately this type would be acceptable to encourage new investment capital. The proposal or a variation thereof was apparently accepted by Charter Oak's board of directors. Accordingly, petitioner and the Corporation subsequently entered into an agreement, dated October 19, 1965, which provided in part as follows: WHEREAS, Conn. Tech. and Crow entered into a certain agreement dated April 16, 1960 [3] and another agreement dated February 19, 1964, and WHEREAS, the parties are desirous of cancelling said agreements and entering into a new *98 arrangement. NOW, THEREFORE, it is agreed between the parties hereto as follows: 1. The said Crow shall return to the said Conn. Tech. all the debentures and all the preferred stock issued to him which are in the face amount of $147,000.00 and which shall be cancelled. 2. Any and all accumulated interest on the debentures purchased by Crow and and all dividends accumulated on the preferred stock purchased by the said Crow are hereby extinguished, waived and relinquished by the said Crow. 3. The said Crow shall return to the said Conn. Tech. 9,000 shars of the 1327 common stock issued to him and shall retain ownership of 3,000 shares of said common stock. 4. Conn. Tech. in further consideration of the promises of the said Crow contained herein hereby releases the said Crow from any and all claims it has or might have against the said Crow by virture of any breach of the agreement of April 16, 1960, [4] and the said Crow hereby releases Conn. Tech. from any and all claims he has against the said Conn. Tech. 5. The said Crow further agrees that upon the execution of this agreement he will immediately resign as Chairman of the Board of Directors of the said *99 Conn. Tech. although he will remain as a director, and further that he will procure the resignations of James T. Glavin and Robert M. Ghen, and further that in order to effectuate his resignation as Chairman of the Board and the resignations of James T. Glavin and Robert M. Ghen as Directors of Conn. Tech. that all documents as determined necessary by Conn. Tech.'s attorney will be signed upon request. 6. All agreements relating to directors and the election of the same, written or oral, except as set forth in this agreement are hereby terminated. 7. The agreement of February 19, 1964 is hereby declared vacated and of no force and effect. The corporation would not have released its potential claims against petitioner, if petitioner had not surrendered his securities in return. The agreement was formally ratified at a special joint meeting of the Corporation's stockholders and directors on October 20, 1965. No stockholder other than petitioner surrendered any stock interest in the Corporation at any time relevant herein. Petitioner resigned as chairman of the Corporation's board of directors on or about October 19, 1965, although he continued to serve as a director. As of *100 the date of the October 19, 1965, agreement, approximately $19,400 in interest had accrued on the debentures purchased by petitioner between May 1, 1960 and February 5, 1962, and of that amount, all but $300 had not been paid. Also, a total of only $300 had been paid on the preferred stock. On October 20, 1965, Charter Oak purchased 5,000 shares of the Corporation's common stock for $5,000. In consideration for petitioner's surrender of stock in the Corporation and pursuant to a prior oral agreement between petitioner and Kneller, Kneller made the following promise in a letter dated November 22, 1965: In consideration for the concessions made during the refinancing negotiations recently completed with Charter Oak Realty I agree to make available to you up to 1,000 shares of Connecticut Technical stock, presently held by me, in the event the Company is sold or "goes public," and the equivalent dollar value of your present 3,000 share holding (as may be split or otherwise changed) does not equal in value your original investment in Connecticut Technical, of $159,000.00. There will be no requirement to transfer stock in excess of the number of shares to achieve the stated total *101 value, and in any event, not more than 1,000 shares. Kneller made the foregoing agreement in return for petitioner's surrender of his securities in the Corporation. However, the record does not disclose whether Kneller's promise bore any relationship to the offer of 1,000 shares originally proposed in the negotiations between the Corporation and Charter Oak. The Corporation's financial statement for the calendar year 1965 reported: On October 20, 1965, at a joint meeting of the Company's Stockholders and Board of Directors, the following transactions were approved and executed: a. 9,000 shares of issued and outstanding, $1 par value common stock, originally sold at par, were donated to the Company. b. 7,350 shares of issued and outstanding, $10 par value, 6% cumulative preferred stock, originally sold at par, were donated to the Company. c. 147 outstanding, 6% debentures with a face value of $500 each were donated to the Company. Prior years' accrued interest of $10,000 applicable to these debentures was also waived. d. 5,000 shares of the acquired common treasury stock were sold for $50,000. e. The acquired preferred stock was retired and the 6% debentures were cancelled.
*102 f. Prior years' accrued interest applicable to the cancelled debentures was reinstated to retained earnings. On their joint income tax return for the calendar year 1965, petitioner and his wife 1328 reported three transactions giving rise to a total long-term capital gain of $106,782 and approximately 25 transactions producing a net short-term capital loss of $49,307. The only other income reported was $2,227 in qualifying dividends and $3,994 in interest. The return disclosed no income received as commissions for underwriting or related activities and no deductible business expenses. The Corporation's earnings and losses for the calendar years 1961 through 1968, as reflected in its profit and loss statements, were as follows: Year
Net Income or Loss
1961
$14,361.96
1962
(19,949.08)
1963
(55,269.91)
1964
21,037.84
1965
(72,443 )
1966
(34,286 )
1967
( 1,061 )
1968
(90,167 )
The Corporation's annual balance sheets reflected the following amounts as total stockholders' equity: Year
Total Stockholders Equity [5]
1961
$ 57,470.48
1962
41,121.40
1963
( 76,516.81)
1964
( 54,578.97)
1965
( 89,195 )
1966
(116,231 )
1967
122,698
1968
90,881
*103 Between October 21, 1965, the day after the date of Charter Oak's acquisition of 5,000 shares of the Corporation's common stock, and June 30, 1969, the Corporation issued approximately 36 stock certificates, representing sales of approximately 14,300 shares of its common stock. The price per share varied between $1 and $100; 11,734 shares were sold for $25 or $25.50 per share; 1,666 shares were sold for $15 per share; and the most recent sale, on June 30, 1969, was 100 shares at $100 per share. Between September 14, 1962, and October 20, 1969, the Corporation maintained an active loan account with the Hartford Bank and Trust Company. At some time, apparently during 1969, the Corporation amended its certificate of incorporation to authorize an increase in the number of shares of its common stock. In addition the Corporation determined to split its outstanding common *104 stock on a 12 1/2 to 1 basis. An exchange on that ratio would leave petitioner with 37,500 shares of common stock. At the time of the trial herein, the Corporation was in the process of obtaining approval from the Securities and Exchange Commission, of a prospectus for an issue of common stock and the planned issue price per share of the common stock as split was $7.50. On their joint Federal income tax return for the calendar year 1962, petitioner and his wife treated his securities in the Corporation as capital assets and claimed a deduction of $159,000 for securities which became worthless during the taxable year. Apart from that deduction the return reported long-term capital gains in the aggregate amount of $293,022.59, against which the foregoing $159,000 deduction was claimed. In his deficiency notice to petitioner and his wife, the Commissioner determined that petitioner's securities in the Coporation did not become worthless during 1962 and increased the net amount of long-term capital gain accordingly. At the trial herein, petitioner conceded that he is not entitled to a deduction as the result of his securities becoming worthless during 1962. Rather he now claims that *105 he incurred a net operating loss during 1965 arising out of the foregoing transaction which generated a net operating loss carryback deduction in the amount of $156,000 for the calendar year 1962. Opinion RAUM, Judge: Petitioner claims that he is entitled to a net operating loss carryback deduction for 1962 based upon a net operating loss in 1965. The burden of proof is upon him. A. Raymond Jones, 25 T.C. 1100, 1104 (acq. 1958-2 C.B. 6), reversed on other grounds, 259 F. 2d 300 (C.A. 5). Petitioner argues that as a result of his surrender of debentures and preferred and common stock to the Corporation in 1965, he sustained a loss which he may carry back to 1962. The Commissioner has advanced a number of contentions in opposition to petitioner's claim, but we need consider only one, which, in our view, is 1329 dispositive of the case. Even assuming that petitioner did sustain a loss in 1965 as a result of his surrender of the Corporation's securities, a matter which is not entirely free of doubt, we conclude that the statute does not permit that loss to be carried back to 1962. Petitioner received a prospectus from the Corporation in *106 1960. Sometime thereafter he purchased 12,000 shares of its common stock. Under a contract dated April 13, 1960, petitioner also undertook to purchase debentures and preferred stock from the Corporation in the total amount of $190,000. After the Corporation's operations turned out to be disappointing, petitioner ceased purchasing the securities described in the 1960 agreement. By that time he had already purchased $12,000 of common stock and $147,000 of preferred stock and debentures. As a result of petitioner's failure to purchase additional securities the Corporation sustained an uncertain amount of damages. The Corporation's officers and its general counsel concluded that petitioner had violated the agreement. In 1964, a settlement agreement was executed whereby the Corporation agreed to relinquish its claim against petitioner and to issue him $157,000 worth of noncumulative preferred stock. In return petitioner agreed to waive whatever rights he had to accumulated interest on his debentures and dividends on his preferred stock, to return all of the debentures and preferred stock, to return 10,000 shares of his common stock, to resign as chairman of the board, and to procure the *107 resignations of two other directors. The agreement was never ratified by the Corporation's board of directors and was not carried out in full. The only performance under the agreement was petitioner's surrender of all of his securities in the Corporation. However, the debentures and preferred stock were not cancelled until October of 1965, and petitioner continued to serve as the chairman of the board of the Corporation. The record is vague as to the status of his common stock during this period. During the summer of 1965, the Corporation received an offer of additional financing from Charter Oak, an outside investor. However, the offer was conditioned upon a change in petitioner's interest in the Corporation. As a result, in October of 1965, petitioner and the Corporation entered into an agreement which rescinded their agreement of 1964 and complied with the wishes of the new investor in eliminating petitioner's preferred position with respect to the Corporation's earnings. Under the 1965 agreement, petitioner agreed to surrender his debentures, preferred stock, and 9,000 shares of common stock, relinquish his claim for accumulated interest on the debentures and dividends on the *108 preferred stock, relinquish any other claims he had against the Corporation, resign as chairman of the board, and procure the resignation of two other directors. In return, the Corporation agreed to surrender whatever claims it had against petitioner by virtue of a breach of their 1960 agreement. In addition, petitioner obtained certain rights in an oral agreement, later reduced to writing, that Kneller would reimburse him to the extent of the value of 1,000 shares of common stock if he eventually sustained a loss in connection with his initial investment. Moreover, petitioner, as the out-going chairman of the board and member of the Corporation's finance committee, doubtless was aware that his agreement with the Corporation was necessary to induce the outside investor, Charter Oak, to make a substantial investment in the Corporation and thereby improve the Corporation's financial status. The 1965 transactions thus amounted to an exchange whereby petitioner surrendered a substantial portion of his rights in the Corporation in return for a release from the Corporation of its claims against him, a promise of reimbursement from the president of the Corporation, and an improved financial *109 status for the Corporation. Regardless of whether petitioner sustained a loss on the exchange, it is clear that the loss, if any, was capital in nature and that it may not be carried back as an operating loss pursuant to the provisions of section 172, I.R.C. 1954. The record establishes that petitioner held the securities for investment purposes, rather than "primarily for sale to customers in the ordinary course of business", and that the securities are therefore capital assets. See section 1221(1), I.R.C. 1954. The terms of the 1960 agreement between petitioner and the Corporation make this clear. The agreement referred to petitioner as the "Investor" and included a provision which was designed to prevent petitioner from making a public sale of the securities purchased pursuant to the agreement. To be sure, during 1960 petitioner held a one-third interest in Pistell, Crow, Inc., an investment banking firm, and was in charge of its underwriting activities. However, 1330 there is no convincing evidence that petitioner's investments in the Corporation were made, directly, or indirectly, in behalf of the firm. The agreement specifically prevented petitioner from making a public *110 sale of the securities. Moreover, it was originally contemplated that petitioner's anticipated total investment of $202,000 and Management's investment of $8,000 would leave only $190,000 as the additional capital required for the Corporation. It is quite unlikely that petitioner undertook to make such a substantial investment in the Corporation in order to advance Pistell, Crow's underwriting activities when the prospects for an underwriting were so limited. On brief, petitioner has stated that he was "in the business of making venture capital investments in startup companies." However, there is no convincing evidence in the record to support this claim. Furthermore, on their 1962 income tax return, petitioner and his wife treated the securities as capital assets in claiming a deduction for securities which became worthless during the taxable year. We conclude that the securities were capital assets and that petitioner's loss on their surrender (if indeed, he sustained a loss at all) was the result of a sale or exchange of capital assets. See sections 165(f), 1211, and 1212, I.R.C. 1954. As such, it is subject to the limitations imposed by sections 1211(b) and 172(d)(2) (A), I. *111 R.C. 1954, which prevent petitioner from taking a net operating loss carryback deduction in 1962 as the result of his surrender of securities in 1965. [6]
We have concluded that petitioner's surrender of the securities was in exchange for a release from the Corporation of its claims against him, a promise of reimbursement from the president of the Corporation, and an improved financial status for the Corporation. However, petitioner has contended that his surrender of the securities was *112 for no consideration. This argument is adequately answered by our findings of fact and by the terms of the 1965 agreement itself. In any event, even if petitioner's argument were accepted, and if such a surrender of securities for no consideration entitled him to a deduction for an ordinary loss, [7] petitioner would still not be entitled to a net operating loss carryback deduction. Section 172(d)(4) provides that for purposes of computing a net operating loss, in the case of a noncorporate taxpayer, "the deductions allowable by this chapter which are not attributable to a taxpayer's trade or business shall be allowed only to the extent of the amount of the gross income not derived from such trade or business." Petitioner's loss (assuming that he did sustain one and that it was ordinary in nature) was not attributable to his trade or business. We have concluded above that petitioner held the securities for investment purposes, and not as part of any trade or business. To be sure, petitioner was active in the Corporation's financial affairs. But his participation was uncompensated, and his surrender of the securities in 1965 was designed to protect his remaining investment. See Eugene A. Mohr, 45 T.C. 600, 610-614; *113 cf. Whipple v. Commissioner, 373 U.S. 193, 201-203; compare Samuel R. Milbank, 51 T.C. 805, 816-817. Consequently, even if petitioner's loss were ordinary, section 172(d)(4) would prevent petitioner from establishing a net operating loss on the basis of his surrender of the securities. The Commissioner has advanced a number of alternative arguments to support his determination. He has argued that petitioner has failed to establish the amount of his loss, that recognition of the loss is precluded by section 267, I.R.C. 1954, and that the surrender of the securities constituted a capital contribution. However, in view of our disposition of the case we need not consider these arguments. Decision will be entered for the respondent. 1331 Footnotes
1. On their income tax returns for 1961 and 1962, petitioner and his wife reported sales of common stock in Pistell, Crow, Inc., in the amounts of $164,284.76 and $18,400, respectively.↩
2. The agreement referred to is the agreement dated April 13, 1960.↩
3. See fn. 2, supra.↩
4. Id.↩
5. The Corporation's financial statements for the calendar years 1963 and 1964 included two balance sheets, one "Before Crow Transactions" and one "After Crow Transactions." The 1964 statement reported that the transactions had not been completed, and the amounts listed above are from the "before" balance sheets.↩
6. Petitioner's claim to a net operating loss carryback deduction appears to rest on the assumption that he may segregate from the rest of his income and deductions in 1965 whatever loss he sustained on the surrender of his securities in the Corporation. Even if this were true, petitioner would still not be entitled to the carryback deduction he seeks, for, as our opinion concludes, the relevant statutory provisions do not permit it. In any event, section 172↩ clearly does not allow petitioner to rely on a single transaction for purposes of computing a net operating loss, and we have found no reason to conclude that when properly calculated, petitioner sustained a net operating loss during 1965.
7. Cf. Charles H. Duell, 19 T.C.M. 1381↩, 1384-1385.